IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-208 |
| | : | CRIMINAL NO. 25-262 |
| YERCY FERNANDEZ SALCEDO | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Yercy Fernadez Salcedo ran a drug trafficking organization by deputizing his younger cousin to run his stash house, full of fentanyl and firearms, around the corner from a playground. The defendant would send his cousin, Mario Fernandez Nunez out on drug buys, in exchange for room and board. After law enforcement executed a search warrant on the house and arrested Fernandez Nunez, the defendant continued selling fentanyl until he found the DEA's GPS tracker on his car and fled to Puerto Rico. A few months later when the defendant returned to the northeast for a quick trip to the New York City, he was arrested with a gun, two extended magazines, and over $9,000 cash. The defendant is a large-scale drug trafficker, with an affinity for firearms, and is a danger to the community. For these reasons, as well as for the reasons provided below, the government recommends a sentence of incarceration within the advisory guideline range of 195 to 228 months' incarceration, followed by five years of supervised release, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

I.     **BACKGROUND**

On July 17, 2025, the defendant pled guilty to Counts One through Six and Eight through Twelve of the Superseding Indictment (Criminal Number 24-208), charging him with conspiracy

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

to distribute 400 grams or more of fentanyl and 500 grams or more of cocaine, numerous counts of distribution of fentanyl, possession with intent to distribute 400 grams or more of fentanyl and 500 grams or more of cocaine within 1,000 feet of a protected location, as well as possession of firearms by a felon and possession of firearms in furtherance of drug trafficking. The defendant also pled guilty to Count One of the Information (Criminal Number 25-262), charging him with possession of a firearm by a felon.  The defendant and the government entered into a written plea agreement, which included that the defendant would not contest forfeiture, and the government would recommend a concurrent sentence.

     During his plea colloquy, the defendant agreed with the government's recitation of the facts. From November 2023 through February 2024, the defendant conspired with co-defendant Mario Fernandez Nunez and others to distribute fentanyl. Typically, the defendant arranged drug sales over the phone and then sent his cousin, co-defendant Nunez to meet the buyer with the narcotics and collect the money. As part of the drug trafficking conspiracy, this defendant stored the narcotics, paraphernalia and packaging materials, as well as numerous firearms in the residence where the co-defendant lived – 4713 Worth Street, Philadelphia, Pennsylvania. This defendant also had a room at 4713 Worth Street, and although it was not his primary residence, he kept his belongings there and would spend the night on occasion.

     Between November 6, 2023, and February 21, 2024, the defendant arranged for numerous fentanyl sales to a DEA confidential source (CS). In total, there were five sales to the CS – two done by the defendant directly, and three by his cousin at the defendant's behest. At the end of February, agents executed a federal search warrant on the 4713 Worth Street stash house, where they recovered the six firearms, tens of thousands of packets of fentanyl, a kilogram of

cocaine, packaging and paraphernalia. Co-defendant Mario Fernandez Nunez was taken into custody at the time and subsequently indicted by a federal grand jury.

After the warrant, the defendant sold fentanyl to the CS two more times. Shortly thereafter, the defendant found the GPS tracker that DEA had installed on his car. In the spring of 2024, the defendant fled to Puerto Rico where he remained in a rural area to avoid apprehension. On July 3, 2024, a federal grand jury returned the superseding indictment charging the defendant along with his cousin.

On July 14, 2024, the defendant traveled to New York City for a couple of days. Law enforcement was able to find the hotel where he was staying and took him into custody. During his arrest, law enforcement recovered a firearm, two extended magazines, 52 rounds of ammunition, and approximately $9,000 cash. Possession of this firearm is the basis of the information for which the defendant has pled guilty.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence.

The total maximum and mandatory minimum sentence for the charges the defendant pled guilty to in the superseding indictment is: lifetime imprisonment, a 15-year mandatory minimum term of imprisonment, a mandatory minimum 10 years' supervised released up to a lifetime of supervised released, $61,500,000 fine, and an $1,100 special assessment. The statutory maximum sentence for the charge the defendant pled guilty to in the information is: 15 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment.

B. **Sentencing Guidelines Calculation.**

The Probation Office correctly calculated the defendant's advisory guideline range at 195 to 228 months in prison. The presentence report correctly determined that the total base offense level for a violation of 21 U.S.C. §860(a) is 34 – the initial base offense level is 32 based on a converted drug weight of 3,367.4 kilograms within 1,000 feet of a protected location, plus 2 under §2D1.2 (a)(1). PSR ¶ 40. Two additional levels are added because the defendant supervised the co-defendant's activities under §3B1.1(c). PSR ¶ 43. After subtracting three levels for acceptance of responsibility, the total offense level is 33. PSR ¶ 47-49.

III. **ANALYSIS**

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public

from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The defendant managed a drug trafficking organization where he employed his younger cousin. He set up his cousin in the stash house, provided him with room, board, and guns, and instructed him to sell deadly narcotics for the organization. The poison that the defendant was involved in putting out on the streets kills people and destroys communities. This Court is all too familiar with the dangers of fentanyl, as the social, economic, and health impacts in this district, and in the City of Philadelphia in particular, are impossible to miss. Each day, three or more people die in Philadelphia of a drug overdose. Dozens more are estimated to experience non-fatal overdoses every day, but experts believe that the tracking of those incidents is underreported. In 2023, 79% of the 1,315 overdose deaths in Philadelphia involved fentanyl.[2]

This drug destroys communities by tearing at the fibers of our society and keeping people living in the devastating cycle of addiction. Fentanyl is a highly addictive and powerful synthetic opioid that is 80-100 times stronger than morphine.[3] In fact, as little as 2 mg of fentanyl – the

---

[2] *See* DEA, Operation Engage – Philadelphia, https://www.dea.gov/operation-engage/philadelphia#:~:text=This%20chart%20examines%20the%20rate,prevent%20overdose%20deaths%20from%20occurring (last accessed Oct. 15, 2025).

[3] *See* DEA, Factsheets – Fentanyl, https://www.dea.gov/factsheets/fentanyl (last accessed Oct. 15, 2025).

amount of a few grains of salt – can be fatal.[4] According to information provided by the DEA Philadelphia Division based on intelligence, investigations, and lab-analyzed drug seizures, in 2024, approximately 75% of fentanyl bags seized by DEA in Philadelphia contained more than a lethal dose of fentanyl.

The impact is not limited to just Philadelphia or any particular social, political, ethnic, or economic group. The impact of fentanyl does not discriminate; it affects every single county in this district and has the potential to destroy any family.

The defendant had a direct role in contributing to this state of devastation and destruction. His conviction makes clear that he is responsible for distributing/possessing with intent to distribute over 1,800 grams of fentanyl. Aside from the fentanyl that the defendant sold to the CS, the fentanyl that was recovered in the defendant's stash house was already packaged into tens of thousands of packets.[5]  Each individual dose is capable of instantly killing the consumer regardless of the person's history or level of addiction. The defendant did not stop at just selling fentanyl, but he took steps to make this deadly drug even deadlier, by mixing it with xylazine, all to make more money and stretch profits. These additives increase the dangers and risk to the consumer because these substances are often unresponsive to Naloxone and have independently harmful side effects.

Xylazine, referred to as "tranq," is a non-opiate sedative, analgesic, and muscle relaxant only authorized in the United States for veterinary use according to the U.S. Food and Drug

---

[4] *See* National Institute on Drug Abuse, Fentanyl, https://nida.nih.gov/research-topics/fentanyl#addictive (last accessed Oct. 15, 2025).

[5] A kilogram of fentanyl is capable of producing approximately 35,000 bags of fentanyl.

Administration. It is often added to fentanyl to prolong the euphoric effects and is increasingly being found in the illegal drug supply and linked to overdose deaths.[6] Xylazine can be particularly dangerous when combined with fentanyl, but on its own has independently harmful side effects including soft tissue necrosis for users who inject the drug.[7]

When the defendant's stash house was raided by DEA, he continued his drug trafficking by selling fentanyl to the CS until he realized that he was being tracked. At that point, he hid in a remote area of Puerto Rico to avoid apprehension. When the defendant returned to the northeast for a short trip, he managed to get a firearm that he is prohibited from possessing. The defendant is a clear danger to the community, concerned only with money, guns, and drugs. (See below pictures recovered from the defendant's phone and social media).



---

[6] CDC, Overdose Prevention – What You Should Know About Xylazine, https://www.cdc.gov/overdose-prevention/about/what-you-should-know-about-xylazine.html (last accessed Oct. 15, 2025).

[7] PubMed, Management of Xylazine-Induced Soft-Tissue Necrosis: A Review of 20 Cases, https://pubmed.ncbi.nlm.nih.gov/39197079/ (last accessed Oct. 15, 2025).



The defendant has one prior conviction from 2015 for possession with intent to distribute a controlled substance, which makes him ineligible to possess firearms. He was sentenced to probation, so he receives one criminal history point. The defendant was arrested twice more after that but has no other criminal history points. Thus, the defendant is in criminal history category 1.

It is clear that the recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). Furthermore, the recommended sentence of incarceration affords

adequate deterrence to others who would commit a similar offense, and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated. *Id.*

In addition, adherence to the recommended guideline range assures that the defendant's sentence is consistent with those imposed nationwide on similarly situated offenders, and thus complying with Section 3553(a)(6) and avoiding undue disparity.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). Also, restitution is not an issue in this case. § 3553(a)(7).

At the same time, the defendant has not set forth any persuasive argument for leniency. The large number of firearms, deadly narcotics, and fact that the defendant fled the jurisdiction to avoid being arrested, while also continuing to sell drugs and possess firearms show his complete lack of interest in leading a law-abiding life. His disregard for the law and the safety of the community warrants a sentence in the guideline range.

## IV.   CONCLUSION

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a within-guideline sentence. As noted, the Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 569 U.S. at 544, and that guide is once again persuasive in this case. The government's final recommendation regarding sentencing appears in the sealed

attachment.

                                          Respectfully submitted,

                                          DAVID METCALF
                                          United States Attorney

                                          */s Shayna Gannone*
                                          SHAYNA GANNONE
                                          Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

    I hereby certify that this Sentencing Memorandum has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

        Dennis Caglia, Esq.
        denniscaglia@comcast.net
        *Counsel for defendant Yercy Fernandez Salcedo*


        */s Shayna Gannone*
        SHAYNA GANNONE
        Assistant United States Attorney


DATED:  November 24, 2025.